PETER SHARPE v. B. B. LARSON.[1]

February 9, 1897.

Nos. 10,348—(271).

**Libel Per Se—Proof of Malice.**

A certain publication made by the defendant of and concerning the plaintiff as an attorney at law and county attorney, set forth in the opinion herein, considered, and *held*, that it is obviously libelous per se, and that the trial court rightly instructed the jury that the plaintiff was entitled to a verdict in some amount without proof of malice.

Appeal by defendant from an order of the district court for Norman county, Ives, J., denying a motion for a new trial. Affirmed.

That part of the article preceding the libel was as follows:

"More Legal Discussion."

"In the Halstad Reporter of Feb. 6 appears an article signed by N. T. Moen, which I think no more than right to answer. Moen says that after a jury of 12 men had taken their solemn oaths to do justice they talk about more cheek than a government mule. How can you be so stubborn, Mr. Moen? Was you not at the trial? Don't you remember the juryman, Martin Brown, who under solemn oath said that he had been on the first jury; knew all about the case and had formed an opinion which could not be removed by evidence; that he could not and would not decide the case impartially, and when I, as defendant, who according to law was entitled to a fair and impartial hearing, kindly asked to have said juryman dismissed you frankly objected. And that man Friday from Hendrum, whom you had been hunting for one solid week, while court was open all the time, sustained your objection. Why did you not allow me a fair trial, Mr. Moen? You say: Why do we establish courts of justice? Why was it that four of the jurymen, who had been on the first jury, and who was so closely connected with the last case, should be on the other case? Why should you have to use the same jury when you had the whole township and

1 Reported in 70 N. W. 1, 554.

village to select a jury from? Mr. Houske was on both juries, and he explained it like this: That in the first case he dismissed Berg because he had not had much experience as a juryman and would not go against the majority, and in the second case he thought that when Berg was dismissed some one had to be guilty. The man went so far as to say that if he had not been on the first jury he should have found me not guilty. He must have gained experience very quickly. He did not look much at the majority this time. Brown and he hung the jury for twelve hours and then did not give up. Don't you think, Mr. Moen, that an explanation from Mr. Houske would have sounded more reasonable if he had said just about like this: 'I have promised Moen, Furuseth & Co. that if I get on the jury I will agree to find Mr. Larson guilty regardless of the evidence.' * * * I will tell you that if you should ever get any experience in law, you will often find that a jury does not decide a case strictly according to law. Now, after this jury agreed two to ten in my favor, you sent Mr. Berg, who had favored you in every point, over to me to ask if I was willing to leave it to him. I said I would not leave it to him, but was willing to leave it to J. W. Johnson, a man who is known all over the country to be one of the most honest and straight men. But no; rather than leave it with a justice that cannot be bribed in open court, you would drop it without trying it at all. Mr. Moen refers us to a case of over one year ago where he was the complaining witness. He also refers us to Judge Furuseth's docket, and speaks of Mrs. Ford, the only disinterested witness in the case. But why did you summon Nels Helgeland and John Sulcrud? or what side did they favor as long as you cannot count them with the disinterested. I have always told Mr. Moen that he knew very little law, and much less common sense. I have often said that if I say anything I can give a reason for same or take it back, and I hope right here that I can give a reason for what I have said to Moen. I remember well that I was arrested by Mr. Moen, as he said and brought before Judge Furuseth. Moen asked for an adjournment in order to get disinterested witnesses, and I suggested that we should go ahead and have a test case. If we both told the truth we would not need any witnesses, and this Moen excepted to, but he did not testify the same way. We had some witnesses who corroborated me, but that was not disinterested witnesses. The judge then told Mr. Moen that there was not enough evidence to hold me. Moen accordingly summoned the good, solid, honest and disinterested witnesses, and among them was this model Mrs. N. D. Ford. But remarkable enough, Moen and I have disagreed so many times, but in regard to the witnesses we agreed to the dot. I think Mrs. Ford was an honest, disinterested witness and told the truth every word she said. But right here is where Moen shows his small common sense, when he refers to Mrs. Ford and Furuseth's docket, which I will refer to as well as Moen. Mrs. Ford corroborated me with every word she said, except one place, and that was where Moen asked me how long time it was from the time I ordered him out till I laid hands on him to move him out. I think I said half a minute, but I also said that I ordered him out two or three times. The

first time I spoke in a common voice, but when it appeared to me that he was somewhat deaf I spoke louder the last time. Mrs. Ford said that it was about two seconds from the time she heard that I ordered him out till I laid hands on him, and Moen said it was no time at all. It also appeared that Mrs. Ford had not paid any attention to our conversation until I spoke in a louder voice than common. Not one of all the rest of the witnesses materially changed my evidence at all, and will challenge Moen, Furuseth & Co. with the docket or anything else. I have often had disputes with Moen when the questions could be decided, and in order to get some satisfaction out of him I have offered to bet him, but he says I always tried to bluff him with money when I know he has none, but now in order to give Moen fair play I will invite him out on a wheelbarrow ride. Now, if Moen can show by the docket or any other way that I lied in that case or any other case, I will be the horse, and if not we'll reverse the matter. And if I cannot prove that Moen lied I will be the horse. The case went on and the judge was very careful to enter on his docket all the proceedings. The evidence of all these disinterested witnesses were just the same as mine, with the exception of Mrs. Ford, in the time between two seconds and half a minute; that is, if I did not order Moen out more than once. I understood that I had no show in Furuseth's court. I did take advantage of a technical law point, and moved to dismiss the action on the ground that I was not offered a jury. This was quite a surprise to them, but the judge was a little quicker to think, and explained it such that I was smart enough to ask for a jury if I wanted one, but I gave them to understand that the law was such that a defendant should be offered a jury, which the judge seemed to believe. But at once the judge took a second thought and claimed that they had offered me a jury. Finally Attorney Moen got encouraged, jumped up and said, 'I object, because we offered him a jury.' I then very kindly asked them what I answered when they offered me a jury. The attorney and the judge both answered at once, and said that I did not answer. Then I was compelled to produce a book that Moen hates very much,—a book written by Arctander, which said that unless I plainly refused a jury I should have one. Then the judge could find no more excuse at once, but found that I was guilty and fined me $10 and costs. I did not kick in the fine, but the judge took pains to express himself about the very small fine he gave me. I could not see the reason for such a small fine. But in examining his docket I found his verdict, as near as I can remember, as follows: 'This court finds probable cause to believe that this defendant is guilty. I will therefore predict him to pay the fine of $10 and costs.' This explained the reason for the small fine. The judge had conscience enough, that should he have decided wrong, the fine would be light. The case was appealed and the proper bond given. Judge Furuseth voluntarily offered to make out notice of appeal. The judge at once went into his office to make out the notice, but shortly came back with a paper in his hand, and asked me if I wanted the appeal on the question of law alone, or law and fact. I told him law and fact. Furuseth told me several times afterwards that he was very

glad that I appealed the question of law and fact so that it could be found out whether he was right in his decision or not, to be sure that everything was all right."

[Here followed the libel quoted in the opinion.]

"B. B. Larson."

*Carmody & Leslie* and *M. A. Brattland*, for appellant.
*Calkins & Sharpe*, for respondent.

START, C. J. Action for a libel. The defendant admitted the publication here in question, and the trial court instructed the jury that it was libelous per se, and that the jury must return a verdict for the plaintiff for damages in some amount. Verdict for $500, and the defendant appealed from an order denying his motion for a new trial.

Practically the only question for our decision is whether the publication was a libel per se. The plaintiff was, during all the times stated in the pleadings, an attorney at law, and county attorney of the county of Norman from January 1, 1894, to January 1, 1895, during which time the defendant was convicted of an assault and battery, on the complaint of N. T. Moen in justice court. He attempted to appeal to the district court, and caused to be served on the plaintiff as such county attorney a notice of appeal. On the plaintiff's motion as county attorney the appeal was dismissed in the district court for the reason that the notice did not state the grounds of the appeal. Afterwards, and after the plaintiff ceased to be county attorney, and on March 12, 1896, the defendant, in reply to a previous publication by Moen relating to the prosecution of the defendant, published in a local newspaper a lengthy article which reflected upon Moen and the justice, and in which he also published of and concerning the plaintiff these words:

"Once, when I was in Ada, I stepped in to the county attorney, and asked him if he had received notice of appeal in my case, and he said, 'Yes,' and Moen was not sure that Judge Ives would hold me on probable cause, so he went to Ada, and persuaded the county attorney to claim that he never received notice of appeal, and the result was that the appeal was dismissed, and I had to pay the fine, and Moen claims he got satisfactory revenge."

A publication which imputes to one holding an office improper conduct therein, or to an attorney at law professional misconduct,

is libelous per se. It is not necessary that the person libeled should at the time of the publication still hold the office. Odgers, Sland. & L. 26; Pratt v. Pioneer Press Co., 32 Minn. 217, 18 N. W. 836, and 20 N. W. 87. If the publication is obviously defamatory, it is the duty of the trial judge, in a civil action, to direct the jury, as a matter of law, that it is a libel per se, and that they must find for the plaintiff. Smith v. Stewart, 41 Minn. 7, 42 N. W. 595. The defendant in such a case cannot be heard to say that he did not intend by the publication to injure the plaintiff. But, where the publication is reasonably susceptible of a defamatory meaning, as well as an innocent one, according to the occasion and circumstances of the publication, the question whether it is libelous is one for the jury. Pratt v. Pioneer Press Co., 30 Minn. 41, 14 N. W. 62; Woodling v. Knickerbocker, 31 Minn. 268, 17 N. W. 387.

The publication here in question falls within the first class, and is obviously defamatory. It is not reasonably susceptible of an innocent meaning, and is a libel per se. It charges the defendant with both professional and official misconduct, in that, contrary to the truth and his duty, he permitted himself to be persuaded to claim in court that he had never received the notice of appeal, whereby the appeal was dismissed, and the defendant unjustly compelled to pay a fine. The charge implies that the plaintiff, as an attorney and officer, by dishonest means and by a false statement of fact to the court, procured the dismissal of the appeal at the instigation of another, who was thereby enabled to claim that "he got satisfactory revenge." Such a charge necessarily tends to diminish public confidence in the plaintiff's official and professional integrity.

The defendant, however, claims that the publication was privileged. There was no evidence in the case tending to show it to be such. The publication was made after the plaintiff had ceased to be county attorney, and at a time when he was not a candidate for any public office. It was not made to any court or officer authorized to inquire into the matter, or in the discharge of any duty, public or private. It was not reasonably necessary for the protection of any interest of the defendant, or for his own vindication. The publication being a libel per se, and not privileged, it follows that the trial court did not err in refusing to direct a verdict in favor of the defendant, or in instructing the jury that the plaintiff was entitled to a verdict for some damages without proof of malice.

The defendant's objections to the questions put to him on cross-examination were rightly overruled, for the questions were proper as a part of the cross-examination, and as tending to show his motive for the publication.

The defendant's last assignment of error is to the effect that the court erred in denying his motion for a new trial. This is insufficient to enable the defendant to raise here the question that the damages awarded are excessive, as the motion for a new trial was based upon three separate grounds, one of which was that the damages were excessive. Hence we cannot consider this question.

Order affirmed.

CANTY, J. (dissenting). I cannot concur in the foregoing opinion. The publication containing the alleged libel is a long, rambling article, in which defendant airs his grievances against Moen. The county attorney is nowhere alluded to, except incidentally in the paragraph quoted in the majority opinion. It is hard to get a clear idea of the situation without reading the whole article. The defendant is evidently a foreigner, whose use and understanding of the English language is not very good; and, being a layman, we cannot hold as a question of law that he has any very definite knowledge of the exact method of procedure in taking appeals in justice's court in criminal cases. Taking the whole article together, it does not clearly appear that he intended to charge that the county attorney acted in bad faith and willfully denied the truth in claiming that he had never received notice of appeal. In the crude manner in which defendant expresses himself, his language is susceptible of meaning merely that the county attorney was imposed upon by Moen, and did not intend to act deceitfully. In my opinion, defendant's meaning was a question for the jury.